# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ALFRED SWAIN** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 08-1643** |
| **BURL CAIN, WARDEN** | * | **SECTION: "N"(3)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.

For the following reasons, it is **HEREBY RECOMMENDED** that the instant petition be denied on the merits.

## PROCEDURAL HISTORY

On August 29, 2002, the Jefferson Parish Grand Jury issued an indictment charging petitioner, Alfred Swain, a prisoner incarcerated in the Louisiana State Penitentiary, Angola, Louisiana, with second degree murder in violation of LSA-R.S. 14:30.1. Petitioner was arraigned on August 30, 2002, and pled not guilty.

Petitioner filed several pretrial motions, including motions to suppress the evidence and the confession. The trial court heard and denied both of those motions on August 21, 2003.

Petitioner was tried by a twelve-member jury on November 4 and 5, 2003. The jury returned a verdict of guilty as charged. Petitioner filed a Motion for New Trial and a Motion for Judgment of Acquittal Not Withstanding the Verdict. The trial court denied both motions on December 1, 2003. Petitioner waived statutory delays, and the court sentenced defendant that day to a mandatory term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.

On March 1, 2005, pursuant to petitioner's appeal, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence. State v. Swain, Number 2004-KA-1001, 900 So.2d 82 (La. App. 5 Cir. 2005). On January 9, 2006, the Louisiana Supreme Court denied petitioner's writ application. State ex rel. Swain v. State, Number 2005-KO-1333, 918 So.2d 1040 (La. 2006).

On November 15, 2006, petitioner filed with the state district court an application for post-conviction relief which the court denied on March 16, 2007.[1] On April 18, 2007, the Louisiana Fifth Circuit Court of Appeal, finding "no error in the trial court's ruling of March 16, 2007," denied petitioner post-conviction relief. Swain v. Cain, Number 2007-KH-254 (La. App. 5 Cir. Apr. 18, 2007) (unpublished decision).[2] On March 7, 2008, the Louisiana Supreme Court similarly denied petitioner relief. State ex rel. Swain v. State, Number 2007-KH-0986, 977 So.2d 899 (La. 2008).

---

[1] State rec., vol. 1of 5.

[2] State rec., vol. 5 of 5.

On March 26, 2008, petitioner filed the instant action for federal habeas corpus relief.[3] In its response, the State does not contest the fact that petitioner has exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509 (1982). The State does, however, contend that petitioner's habeas application is time-barred. For the following reasons, the court finds that petitioner's action is, in fact, timely.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner has one year within which to bring his habeas corpus claims pursuant to 28 U.S.C. § 2254, with this one year period commencing to run from "the latest of" either the date the petitioner's state judgment became final or the expiration of his time for seeking review.[4] See 28 U.S.C. § 2244(d)(1) (West 2008), as amended by the AEDPA, P.L. 104-132, 110 Stat. 1220. The State argues that petitioner's state judgment became final on March 31, 2005, and his one-year time limit under the AEDPA commenced to run, when the thirty-day time period, under the provisions of Louisiana Supreme Court Rule X, Section 5, expired for submitting a writ application seeking relief in connection with the state appellate court's March 1, 2005 adverse decision. See Butler v. Cain, 533 F.3d 314, 317-318 (5th

---

[3] See Federal rec., doc. no. 3. This March 26, 2008 filing date was ascertained via the court's use of the prison "mailbox" rule first enunciated in Houston v. Lack, 487 U.S. 266 (1988). See Causey v. Cain, 450 F.3d 601, 604-607 (5th Cir. 2006); Weaver v. Cain, 2005 WL 1400409, *2-5 (E.D. La. 2005). Under this rule, a pleading filed by a prisoner acting *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court. Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Generally, the date a prisoner signs his petition or accompanying pauper application is presumed to be the date he delivered it to prison officials for mailing. See Colarte v. Leblanc, 40 F.Supp.2d 816, 817 (E.D. La. 1999); Magee v. Cain, 2000 WL 1023423, *4 n.2 (E.D. La. 2000); Punch v. State, 1999 WL 562729, *2 n.3 (E.D. La. 1999).

[4] The AEDPA applies to this case as it was filed after the enactment of the AEDPA, or after April 24, 1996. Lindh v. Murphy, 521 U.S. 320 (1997).

Cir. 2008) (writ application with the Louisiana Supreme Court filed outside the prescribed 30-day time period for seeking relief in connection with state appellate court adverse direct review opinion does not toll AEDPA's one-year prescriptive period).

As noted earlier, a pleading filed by a prisoner proceeding *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing.[5] Petitioner has provided to the court an affidavit (rec. doc. 14) attesting that he delivered his Louisiana Supreme Court writ application for mailing to prison "classification officer" Arvin Marcantel on March 31, 2005. Attached to petitioner's affidavit is a copy of an "Inmate's Request for Legal/Indigent Mail" reflecting classification officer Arvin Marcantel's receipt on March 31, 2005 of petitioner's "Certiorari Brief" for mailing to the "Supreme Court of Louisiana". The State, in response, has submitted no evidence refuting the veracity of petitioner's affidavit or the authenticity of the attached "Inmate's Request for Legal/Indigent Mail".

Based upon petitioner's affidavit and attached "Inmate's Request for Legal/Indigent Mail", the Court finds that petitioner's writ application to the Louisiana Supreme Court, seeking relief in connection with the Louisiana Fifth Circuit's March 1, 2005 adverse opinion, was timely filed on March 31, 2005. As such, petitioner's state court judgment did not become final until the Louisiana Supreme Court issued its adverse decision on January 9, 2006, State ex rel. Swain v. State, Number 2005-KO-1333, 918 So. 2d 1040 (2006), and petitioner's time for seeking review did not expire until 90 days later, on or about April 9, 2006. See Sup.Ct.R. 13(1); see also Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999), cert. denied, 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000);

---

[5]See discussion supra at n. 3.

4

Habteselassie v. Novak, 209 F.3d 1208, 1209 (10th Cir. 2000); Harris v. Hutchinson, 209 F.3d 325, 328 n.1 (4th Cir. 2000). Thus, petitioner had a year from April 9, 2006, until April 9, 2007, to timely seek habeas corpus relief.

Petitioner did not file the instant action until March 26, 2008, almost a year after his limitation period had expired. Thus, petitioner's federal habeas corpus application must be dismissed as untimely, unless the one-year statute of limitations period was interrupted as set forth in 28 U.S.C. § 2244(d)(2). Under that statutory provision, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

On November 15, 2006, petitioner filed an application for post-conviction relief with the state district court, thereby suspending the running of prescription. At that point, approximately seven months of petitioner's twelve-month prescriptive period had expired.

By virtue of petitioner commencing state post-conviction proceedings, his statute of limitations remained suspended until March 7, 2008, when the Louisiana Supreme Court denied his application for post-conviction relief. State ex rel. Swain v. State, Number 2007-KH-0986, 977 So.2d 899 (La. 2008). At that point, prescription once again commenced to run and continued to run for nineteen days until petitioner, on March 26, 2008, filed the instant action. Because petitioner, at the time he filed his federal habeas petition, still had over four months of his one-year prescriptive period remaining, the instant matter is clearly not time-barred. Accordingly, the court shall review the applicable facts and proceed to address the merits of petitioner's claims

**FACTS**

Lutricia Lindsey testified that the murder victim, Toni Joseph Swain, was her daughter. Toni was married to defendant, Alfred Swain. She was thirty-one years old when she died on June 29, 2002. Ms. Lindsey testified that Toni and her other three daughters gave her a surprise birthday party at her (Ms. Lindsey's) home that day. Toni was shot and killed outside the home of Ms. Lindsey's neighbor, Leroy Brown. Ms. Lindsey did not witness the shooting, as she was inside her house when it occurred.

Felicia Walker, Toni's sister, testified that her mother, Ms. Lindsey, lives at 2056 Lincolnshire Drive in Marrero. After her mother's party ended, Ms. Walker sat in a chair in front of the house. Toni was talking to Leroy Brown in front of his house next door. Ms. Walker testified that she heard a "pop, pop" sound. There was a pause, and then another "pop, pop." Ms. Walker saw smoke, and smelled something burning. She grabbed her daughter and lay on the ground. When the popping sound stopped, she turned toward Brown's house and saw defendant calmly walking to his truck, which was parked in the middle of the street. Toni was lying in Brown's driveway. Ms. Walker ran inside her mother's house and told her, "Alfred just shot Toni, call 911."

Leroy Brown testified that, at the time of the murder, he lived at 2052 Lincolnshire Drive. On June 29, 2002, he was standing outside his house talking to Toni, whom he had known from the time she was ten or eleven years old. Twenty to thirty minutes into their conversation, defendant arrived in a burgundy colored Chevrolet truck. Toni said to defendant, "[W]hat do you want? Leave me alone." Defendant got out of the truck and walked toward Toni. Defendant said, "Bitch, didn't I tell you I was going to get you." Defendant "came up with" a gun and fired a shot into Toni's side. Defendant then said, "[N]ow I'm going to kill you." Defendant then stood over her and fired

additional shots at her. After defendant shot Toni, he got back into his truck and left the scene. The couple's five year old daughter witnessed the shooting.

Dr. Susan Garcia, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. She testified that the victim sustained three recognizable gunshot wounds to the body, and one graze wound to the neck. One bullet entered the right front part of the body beneath the right breast. The bullet traveled through the body, exiting the right side of the back. That bullet did not injure any vital structures, and was not a lethal wound.

A second bullet entered the victim's right chest injuring a lung. Dr. Garcia recovered the bullet from the left back side of the body. The doctor testified that the injury could have been lethal, depending on how much blood the victim lost, and whether or not medical care was administered.

A third bullet entered the victim's left cheek. A projectile was recovered from that area. The bullet injured, but did not penetrate, the brain. That wound could have been lethal, in that the projectile could have caused a concussion or contusion to the brain. Dr. Garcia identified State's Exhibits 44 and 45 as the projectiles recovered during the autopsy.

Sergeant Ralph Parker of the Jefferson Parish Sheriff's Office testified that at 11:45 p.m. on June 29, 2002, he was standing in front of the Detective Bureau. Defendant arrived in a maroon colored truck. Defendant introduced himself to Parker, and calmly informed the officer he wished to turn himself in for the Lincolnshire murder. Parker testified that he already knew about the

murder.  Parker handcuffed defendant and advised him of his <u>Miranda</u> rights.[6]  He then sent for homicide detectives.

Parker testified that there were two female passengers in the truck.  Two other officers who were outside asked the women to get out of the vehicle.  The officers saw a gun inside the truck.  Parker told them not to seize the weapon at that point.

Lieutenant Gray Thurman, a homicide detective, testified that he and Detective Meunier arrived at 2052 Lincolnshire Drive within an hour of the shooting.  Thurman learned the victim had been taken to a hospital.  He assigned Detective Donald Meunier as the case officer, and the two detectives processed the crime scene.  In the driveway of the residence, they located four shell casings, two bullet fragments, a pair of eyeglasses, and a large blood stain.  Afterwards, they went to the Detective Bureau to interview witnesses.  Defendant arrived there and surrendered.  Thurman testified that he escorted the handcuffed defendant from the front of the building to an interview room.

Thurman advised defendant of his <u>Miranda</u> rights, using a sheriff's office rights form.  Defendant signed the form, indicating he understood his rights, and wished to waive them. Thurman testified that he and Meunier interviewed defendant.  The interview was recorded on audiotape and a transcript of the tape was preserved as evidence.

Defendant told the detectives that he had recently filed for a divorce from Toni.  He had learned that she was seeing another man.  Defendant was aware that the victim had obtained a

---

[6]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

restraining order, which had the effect of preventing him from seeing his six-year-old daughter, Asia, who was living with Toni.

Defendant admitted to having shot and killed Toni, but said that he did not know why he had done it. Defendant said he fired four shots; two into the victim's upper body, one to the neck, and another to the head. Toni was still moving after the first two shots, but she stopped moving when the third shot struck her in the neck. After the shooting, he went to his mother's house. Defendant told the officers that the gun he used to shoot Toni was a .9mm handgun and that it was on the floorboard of his truck. He had removed the clip.

Detective Thurman testified that defendant's manner during the interview was matter-of-fact, deliberate, and articulate, as if he were describing an event in which he had not participated. Defendant expressed remorse for his daughter, who had witnessed the shooting, but he did not express remorse for killing the victim.

Detective Meunier testified that when he and Thurman took defendant into the Detective Bureau, he instructed other officers to secure the truck until it could be moved. When the interview was completed, Meunier applied for and obtained a search warrant for defendant's truck. The warrant was executed on July 1, 2002. Officers seized a Taurus .9mm semi-automatic handgun with nine .9mm rounds and five .38 caliber rounds.

Timothy Scanlan of the Sheriff's Office Crime Lab, was accepted by the court as an expert in firearms examination. He testified that he test-fired the .9mm semi-automatic handgun. He determined that four bullet casings recovered from the scene were fired from that weapon. He also

found that the two bullets recovered from the body were fired from that gun.  Scanlan testified that there were two specimens that were so damaged as to make a comparison impossible.

Defendant's mother, Catherine Sterling, testified for the defense.  She stated that defendant went to her house after the shooting.  He told her he had had an "incident" with his wife.  She testified that defendant contemplated killing himself, but that he eventually decided to turn himself in to police.

Defendant testified on his own behalf.  He stated that he and the victim had been married for eight years.  There had been problems in their marriage.  In August, 2000, he discovered a used condom in a wastebasket in their home.  He confronted the victim about it, and learned that she had been having an affair with another man.  The couple separated.  They reconciled briefly in late 2001, and then separated again.  They reconciled again in early 2002, although Toni continued to be unfaithful.

Defendant testified that, on the day of the shooting, he worked until 3:00 p.m. at his job in furniture repair at Compass Furniture.  On his way home, he stopped at another furniture store and bought two appliances.  He arrived at his apartment at around 4:00.  He and the victim were separated at that time, and he packed some boxes to prepare for his move to a new residence.

Defendant testified that he thought about his family, and decided to drive to the residence of his wife and children.  He saw that they were not at home, so he went to Ms. Lindsey's house.  He saw Toni talking to Leroy Brown, put the truck in reverse and exited.  He walked toward Toni, fired

his gun at her and got back into his truck. He realized what he was doing, but it didn't seem to him like it was happening.

Defendant went to his mother's house and told her that he had shot Toni. His mother asked whether Toni was dead, and defendant responded, "I believe that she is." Defendant testified that he went into his mother's backyard and prepared to commit suicide by shooting himself. His mother called him inside, however, and he did not attempt suicide. He then decided to turn himself in to authorities.

Defendant testified that he did not plan to kill Toni. Even when he grabbed his gun and exited his truck, it was not his intention to kill her. He testified that he keeps a gun with him at all times for his own safety.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent
> meaning. A federal habeas court may issue the writ under the "contrary to" clause if
> the state court applies a rule different from the governing law set forth in our cases,
> or if it decides a case differently than we have done on a set of materially
> indistinguishable facts. The court may grant relief under the "unreasonable
> application" clause if the state court correctly identifies the governing legal principle
> from our decisions but unreasonably applies it to the facts of the particular case. The
> focus of the latter inquiry is on whether the state court's application of clearly
> established federal law is objectively unreasonable, and we stressed in Williams[ v.
> Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an
> incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will

give deference to the state court's decision unless it "was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2);

see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### A.  Insufficiency of Evidence

Petitioner complains that insufficient evidence was submitted to support his conviction for

second-degree murder. Petitioner argues that based upon the trial evidence, he should have been

convicted of the lesser offense of manslaughter rather than second degree murder.

Petitioner raised this claim in his state post-conviction application. In its March 16, 2007 Order, the state district court denied petitioner's insufficiency of evidence claim pursuant to LSA-C.Cr.P. art. 930.4(C) due to petitioner's failure to raise the claim on direct appeal.

Generally, a federal court will not review a question decided by a state court if the decision of that court rests on a state ground that is both independent of the federal claim and adequate to support the decision. Glover v. Cain, 128 F.3d 900, 902 (5th Cir.1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citation omitted). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Glover, 128 F.3d at 902. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

For this state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. Amos, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. Glover, 128

F.3d at 902.  A state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief.  Id.

In the instant matter, the state district court issued the last reasoned opinion.  As noted above, the court denied petitioner's claim pursuant to LSA-C.Cr.P. art. 930.4(C) due to petitioner's failure to raise the claim on direct appeal.  As the court expressly relied upon the above-enunciated procedural bar, the bar is presumed to be independent and adequate.  Amos, 61 F.3d at 338; Glover, 128 F.3d at 902.  Accordingly, the instant claim is not subject to federal review.

A federal habeas petitioner, however, may be excepted from the procedural default rule if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." Glover, 128 F.3d at 902 (citation omitted); Amos, 61 F.3d at 338-39 (citations omitted).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  The mere fact that petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.  Id. at 486.

In his traverse (rec. doc. 16), petitioner offers as "cause," for not raising his insufficiency of evidence claim on direct appeal, that he did not have a copy of his trial transcript at the time his direct appeal was filed and that his appellate counsel was ineffective in failing to raise the argument in his direct appeal brief.  However, petitioner was present every day of trial and knew the evidence which

was submitted against him.  He did not need a copy of the trial transcript to raise his insufficiency of argument claim.  Further, petitioner was not precluded, in connection with his direct appeal, from providing to the court a *pro se* brief, in addition to the brief submitted by counsel, raising his insufficiency of evidence argument.  Accordingly, the court finds that petitioner has failed to make the necessary showing of "cause" to excuse his state procedural default.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."  Hogue v. Johnson, 131 F.3d 466, 497 (5th Cir.1997) (citation omitted).  Having failed to show an objective cause for the default, the court need not determine whether prejudice existed.  Further, petitioner has not alleged any actual prejudice.  Ratcliff v. Estelle, 597 F.2d 474 (5th Cir.1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681-82 (5th Cir.1977)).

The instant claim is therefore procedurally barred from review by this federal habeas corpus court absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed.  Hogue, 131 F.3d at 497 (citation omitted).  To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence."  Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); accord Glover, 128 F.3d at 902.  To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to his guilt.  Campos v. Johnson, 958 F.Supp. 1180, 1195 (W.D. Tx.1997) (footnote omitted); Nobles v. Johnson, 127 F.3d 409, 423 n. 33 (5th Cir. 1997), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998) (actual innocence factor requires a showing by clear and

convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.")  When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception.  <u>Glover</u>, 128 F .3d at 903.

Petitioner does not present and the record does not contain evidence that suggests his actual innocence.  Accordingly, petitioner has failed to overcome the procedural bar to the instant claim.  As such, the claim is procedurally barred and must be dismissed with prejudice for that reason.  Alternatively, as shown below, the claim is also without merit.

When conducting a sufficiency of the evidence review, courts generally adhere to the standard set forth by <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  In <u>Jackson</u>, the Court held that a claim of insufficient evidence would lie if, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt.

Petitioner was convicted of second degree murder.  Second degree murder is defined under LSA-R.S.14:30.1 as the killing of a human being when "the offender has a specific intent to kill or to inflict great bodily harm."

A review of the trial transcript reveals that Leroy Brown testified that he was talking to the victim when petitioner drove up in his truck, proceeded to walk toward them, shot the victim in the side, then stood over the victim and "went to shooting."[7]  Mr. Brown testified that before firing the

---

[7]State rec., vol. 3 of 5, p. 365, lines 13-28.

first shot, petitioner stated: "Bitch, didn't I tell you I was going to get you".[8]  After the first shot,

Brown heard petitioner state: "[N]ow I'm going to kill you" and then petitioner proceeded to shoot

some more.[9]  The victim's sister, Felicia Lindsey Walker, testified that she was sitting in a chair on

the driveway when she heard a popping noise.  She grabbed her daughter and hit the ground and

heard more popping noise.  When she heard "the last set of pops", she looked up and saw petitioner

walking towards his truck and saw her sister lying on the ground.[10]  The assistant coroner, Dr. Susan

Garcia, testified that the victim was shot four times, sustaining three gunshot wounds to her body and

a graze wound to her neck.[11]

Clearly, viewing the above-described evidence in a light most favorable to the prosecution,

a rational trier of fact could find that petitioner had a specific intent to kill or inflict great bodily harm

upon the victim.  Accordingly, petitioner's insufficiency of evidence claim is without merit.

### B.  Suppression of Evidence

Petitioner contends that the trial court erred in failing to suppress evidence, specifically, the

murder weapon, that was discovered in his truck following a search performed pursuant to a search

warrant.  Petitioner claims the search warrant was invalid because "it was signed by a Commissioner

instead of an elected judge."  This court, however, need not address the merits of the above argument

---

[8]State rec, vol. 3 of 5, p. 366, line 11.

[9]State rec., vol. 3 of 5, p. 366, lines 12-13.

[10]State rec., vol. 3 of 5, p. 357, lines 3-19.

[11]State rec., vol. 4 of 5, p. 419, lines 1-14; p. 423, lines 4-6.

due to the mandate enunciated in Stone v. Powell, 428 U.S. 465 (1976). In Stone, the United States Supreme Court concluded:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Id. at 481-482 (footnote omitted).

In interpreting Stone, the Fifth Circuit has opined that an "opportunity for full and fair litigation" means just that: "an opportunity." Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002), cert. denied, 537 U.S. 1196, 123 S.Ct. 1264, 154 L.Ed.2d 1034 (2003) (citing Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978)). Even if a defendant fails to take advantage of his opportunity to litigate his motion to suppress, the fact that the opportunity was there suffices for the Stone bar to apply. Janecka, 301 F.3d at 320. Furthermore, the Fifth Circuit has held that the Stone bar applies despite an error by the state court in deciding the merits of a Fourth Amendment claim. Swicegood v. Alabama, 577 F.2d 1322, 1324-1325 (5th Cir. 1978).

In the present matter, petitioner does not contend that he was deprived of the opportunity to litigate his Fourth Amendment claim fully and fairly in the state court system. Rather, his argument addresses his dissatisfaction with the ultimate adverse ruling.

The record reflects that a motion to suppress was filed and adjudicated on the state district level. Further, the suppression issue was reurged, on appeal, and once again rejected. See State v. Swain, 900 So. 2d 82, 87-89 (La. App. 5 Cir. 2005). Lastly, the Louisiana Supreme Court rejected

petitioner's argument by denying his writ application.  <u>State ex rel. Swain v. State</u>, 918 So.2d 1040 (La. 2006).

In short, petitioner's Fourth Amendment claim is not properly before this court because the requirements set forth in <u>Stone</u> have been met through state court proceedings.  Accordingly, the instant claim for habeas corpus relief should be denied.

### C.  Denial of Challenge for Cause of Alternate Juror Gauslin

Petitioner argues that his right to a fair trial was violated when the trial judge denied his challenge for cause of prospective alternate juror Robert Gauslin.  Under Supreme Court law, a trial court's decision with respect to whether a prospective juror should or should not be struck for cause is entitled to considerable deference.  <u>Wainwright v. Witt</u>, 469 U.S. 412, 428 (1985).  The trial judge, in this instance, did not abuse the deference to which he is entitled.

In addressing this issue in connection with petitioner's direct appeal, the Louisiana Fifth Circuit reviewed the pertinent facts:

> After a twelve-person jury had been selected, the trial court granted the state and the defense two peremptory challenges each in the selection of two alternate jurors. The record shows that defendant exhausted both of those challenges.

> Robert Gauslin, a prospective alternate juror, stated during voir dire that he had been the victim of an attempted armed robbery.  That experience, along with his exposure to crime during a stay in New York City, had led him to believe "people are capable of crime."  When the judge asked him whether he would be able to give defendant the presumption of innocence, Gauslin replied, "I'll try like hell."  The judge then asked Gauslin whether he would find defendant guilty just because he did not believe in people.  Gauslin said, "Well, you know I'll try to do the best I can."

> The judge asked Gauslin if he could give defendant a fair trial, and Gauslin replied, "I don't know.  You're talking about a persons [sic] life."  The juror then said, "I don't know.  I mean I don't know.  I just know what happens and that's all I can tell

you." When the judge asked him if he would give defendant a fair trial, Gauslin said, "Well, I can try." He then said, "Well, I'll try-yeah, I don't see why I can't." The prosecutor later asked Gauslin how he would vote if the state did not put on any evidence. Gauslin replied that he would vote "not guilty."

Defense counsel moved the court to strike Gauslin for cause. The judge denied the motion. Defense counsel objected to the court's ruling, thereby preserving the issue for appeal. The state used a peremptory challenge to strike Gauslin.

Defendant does not show that he was forced to accept an objectionable juror due to the trial court's denial of his challenge for cause. Gauslin was ultimately stricken by the state. In any case, the record shows that the alternate jurors were dismissed at the start of deliberations. They, therefore, had no effect on the verdict in this case. Absent a showing of actual prejudice, defendant's claim fails. This assignment of error has no merit.

Swain, 900 So.2d at 94 (footnote and citations omitted).

Based upon the above, the court finds that petitioner's right to a fair trial was not violated by virtue of the trial court's denial of his challenge for cause with respect to prospective alternate juror Robert Gauslin. Accordingly, the instant claim for habeas corpus relief is without merit.

### D. Denial of Challenge for Cause of Juror Cacibauda

Petitioner argues that the trial court erred in denying his challenge for cause of Juror Cacibauda. According to petitioner, Mr. Cacibauda should have been excused for cause due to his belief that a defendant should take the stand and that a defendant must have something to hide if he decides not to testify at trial.

Petitioner raised this claim in his state post-conviction application. In its March 16, 2007 Order, the state district court denied the instant claim pursuant to LSA-C.Cr.P. art. 930.4(C) due to petitioner's failure to raise the claim on direct appeal. As noted earlier, a federal court generally will not review a question decided by a state court if the decision of that state court rests on a state ground

that is both independent of the federal claim and adequate to support the decision. <u>Glover v. Cain</u>, 128 F.3d 900, 902 (5th Cir.1997); <u>Amos v. Scott</u>, 61 F.3d 333, 338 (5th Cir.1995) (citation omitted). (*See* discussion above.)

In the instant matter, the state district court issued the last reasoned opinion. As the court expressly relied upon the above-enunciated procedural bar, the bar is presumed to be independent and adequate. <u>Amos</u>, 61 F.3d at 338; <u>Glover</u>, 128 F.3d at 902. Accordingly, the instant claim is not subject to federal review unless the exception set out above applies.

In his traverse (rec. doc. 16), petitioner offers as "cause" for not raising the instant claim on direct appeal the same justification for his having failed to raise his insufficiency of evidence claim on direct appeal, namely, the fact that he did not have a copy of his trial transcript at the time his direct appeal was filed and that his appellate counsel was ineffective in failing to raise the argument in his direct appeal brief. However, petitioner was present when voir dire was conducted and knew the trial court had denied his challenge for cause with respect to juror Cacibauda. He did not need a copy of the trial transcript to raise his claim that the trial court erred in failing to strike Mr. Cacibauda for cause. Further, petitioner was not precluded, in connection with his direct appeal, from providing to the court a *pro se* brief, in addition to the brief submitted by counsel, raising his claim that the trial court erred in failing to strike Mr. Cacibauda for cause. Accordingly, the court finds that petitioner has failed to make the necessary showing of "cause" to excuse his state procedural default.

The instant claim is therefore procedurally barred from review by this federal habeas corpus court absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed. <u>Hogue</u>, 131 F.3d at 497 (citation omitted).

Petitioner does not present and the record does not contain evidence that suggests his actual innocence.  Accordingly, petitioner has failed to overcome the procedural bar to the instant claim.  As such, the claim is procedurally barred and must be dismissed with prejudice for that reason.  Alternatively, as shown below, the claim is also without merit.

In Uttecht v. Brown, 127 S.Ct. 2218, 2230 (2007), the Supreme Court made clear that a trial court is entitled to "broad discretion" in determining whether a veniremen is biased and should be struck for cause.  This is especially true where there has been a "lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*."  Id.

A review of the trial transcript reflects that considerable questioning was undertaken to ascertain whether Mr. Cacibauda would make a suitable juror.  First, the prosecutor questioned Mr. Cacibauda regarding whether he would be unfavorably swayed by the fact that a defendant did not testify at trial.  When Mr. Cacibauda indicated that he believed a defendant should take the stand in order to defend himself, the prosecutor posed several more questions to Mr. Cacibauda.  This questioning concluded with Mr. Cacibauda admitting that he could see why a defendant may be hesitant to take the stand, but stating that he would still like to hear what the defendant had to say.[12] The subject, however, was not abandoned at that point.  Before voir dire ended, the trial judge questioned Mr. Cacibauda as to whether or not he would hold a defendant's decision not to testify at trial against the defendant.  The court's extensive colloquy with Mr. Cacibauda ended with the

---

[12]State rec., vol. 3 of 5, p. 217, lines 6-30; pp. 218-223; and p. 224, lines 1-13.

court confirming that Mr. Cacibauda would "not take away any points because [the defendant] didn't testify."[13]

Based upon the above, this court finds that the trial court did not abuse his considerable discretion in declining to excuse Mr. Cacibauda for cause. Accordingly, petitioner's claim for habeas corpus relief based upon the trial court's failure to strike Mr. Cacibauda for cause is without merit.

### E. Trial Court Erred in Failing to Grant Mistrial and Failing to Order Competency Hearing Based Upon Petitioner's Mid-Trial Mental Incompetency[14]

Petitioner argues that the trial court erred in failing to grant a mistrial and failing to order a competency hearing when, during the trial, an issue arose with respect to petitioner's mental competency. Petitioner's mental competence became an issue in connection with the prosecutor's cross-examination of petitioner. In addressing this matter on direct appeal, the Louisiana Fifth Circuit Court of Appeal explained:

> In the instant case, defendant did not raise the issue of competency prior to trial, or during the state's case. Defendant was the final witness to testify. He was able to answer all of his attorney's questions on direct examination, and did not seem to have any trouble recalling the events leading up to the shooting. He appears to have become agitated when, during cross-examination, the prosecutor questioned him about whether he had planned the shooting in advance.
>
> Defendant began to offer comments and explanations that were not responsive to the prosecutor's questions. The following exchange ensued:

---

[13]State rec., vol. 3 of 5, p. 247, lines 23-30; p. 248; p. 249, lines 1-13.

[14]The instant claim represents a consolidation of the claims designated in petitioner's habeas application (rec. doc. 3) as claim nos. 5 and 6.

THE COURT:

Sir, you can explain your answer, you really need to try to confine your answers to the questions. All right, we need to-I think we've kind of gone off on a tangent.

THE WITNESS:

Your Honor, when these jurors were being interviewed, several of these jurors I picked because they said-these people, they said they wanted to hear the truth. You see when you try something to hide [sic], you see, that's why I was happy when he said-the District Attorney said, I'm good at tripping up because you see, you can't trip up the truth.

THE COURT:

Listen to me, we got to play within the rules. The rules are that they ask questions and you answer them, okay. It's not for-

THE WITNESS:

But you see what's happening-

THE COURT:

-listen, please listen to me. It's not for you to ask questions to me or you to ask questions to them. All right, [he] get[s] to ask you questions and you can answer them and you can explain them all you want. Like I've said now for the third time, your attorney will get a chance to come back-if you think Mr. Mary's [sic] [the prosecutor] [is] trying to trick you or whatever, your attorney's going to get his chance to clear it all up as soon as he's done, okay.

THE WITNESS:

I'm not-Mr. Mary-I'm asking the Court's indulgence.

THE COURT:

Listen, it's not how-

THE WITNESS:

    -what I'm trying to say is that-

THE COURT:

    -it's not a question of me indulging you or not. It's the Legislature [that] tells us how we have to operate and I operate that way.

THE WITNESS:

    But then you have a person just being talked to and he's not have [sic] the freedom of speech or rights to talk to these people, that's what they said when they was [sic]-when y'all were asking these ladies and gentlemen-these ladies and gentlemen said they wanted to hear-

MR. BOSHEA [defense counsel]:

    Mr. Swain, enough, enough.

THE WITNESS:

    Well, this is not fair.

THE COURT:

    Listen, you can explain your question-your answers all you want. I would ask that you try to tailor your explanation to the question and not go[] off on a tangent. All right, come on, Mr. Mary, let's move on.

The prosecutor continued with the cross-examination, and at times defendant gave long, unresponsive answers. Finally, the judge intervened again:

THE COURT:

    Sir, wait, wait, wait, if you're not going to answer his questions, I'm not going let you sit up here and ramble.

THE WITNESS:

    May I be excused, please?

THE COURT:

    No, you-are you finished, Mr. Mary?

MR. MARY:

    I-

THE COURT:

Your attorney may have some-

THE WITNESS:

    I don't want to answer nothing. I really don't.

THE COURT:

    Well, why don't y'all confer for a second, all right, before we
do this.

MR. BOSHEA:

    I don't have any further questions.

Swain, 900 So.2d at 90-91.

    Based upon the above, petitioner's counsel moved for a mistrial which the trial court denied.

Petitioner claims that the trial court erred in failing to grant counsel's mistrial and in failing to order

a competency hearing.

    In addressing this claim, the Louisiana Fifth Circuit first enunciated applicable Supreme Court

law which provides: "A criminal defendant has a constitutional right not to be tried while legally

incompetent. Medina v. California, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353, 365-

366 (citing Drope v. Missouri, 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975))."

Strain, 900 So.2d at 89. See also Pate v. Robinson, 383 U.S. 375 (1966). In determining that the trial

26

court did not violate petitioner's constitutional right in this regard, the state appellate court reasoned:

> Defense counsel offered no evidence of defendant's inability to proceed. Counsel did not allege that defendant had been unable to assist him during the course of the trial, or that defendant did not understand the proceedings....
>
> Based on defendant's own statements to the court, it is apparent that he assisted his attorney in choosing the jury. There is nothing in the record to show that he did not sufficiently assist his attorney throughout the trial. Defendant's trial testimony shows that he was able to recall the events leading up to the shooting, and to recount them in great detail. It appears that defendant became emotionally upset and frustrated during cross-examination. The prosecutor simply asked questions he did not wish to answer. The trial judge, who was in a position to observe defendant's demeanor on the stand, did not feel that his behavior indicated he was incompetent to proceed.

Swain, 900 So.2d at 93.

This court finds that the above-reasoning of the state appellate court does not represent an unreasonable application of Federal law and, therefore, petitioner's claim for habeas relief is without merit.

### F. Ineffective Assistance of Counsel

Petitioner argues that his counsel, Kevin Boshea, Esq., was ineffective for failing to pursue an insanity defense and failing to request the appointment of a sanity commission. Petitioner also contends that counsel was ineffective for failing to use a peremptory challenge against juror Michael Cacibauda.

The seminal Supreme Court decision regarding ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 697 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was

deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner

has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the

claim without addressing the other prong.

Under the deficient performance prong of the <u>Strickland</u> test, "it is necessary to 'judge ...

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993), <u>citing</u> <u>Strickland</u>, 466 U.S. at 690.  To

prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." <u>Strickland</u>, 466 U.S. at 694.

With regard to petitioner's ineffectiveness claim based upon counsel's failure to pursue an

insanity defense or seek a sanity commission, as petitioner points out in his supporting memorandum,

and as evidenced by discussions held outside the presence of the jury following petitioner's cross-

examination,[15] it was defense counsel's opinion that petitioner was not mentally incompetent.

Counsel's opinion in this regard is borne out by the evidence which, as the state appellate court

observed, reflected:

> [H]e assisted his attorney in choosing the jury.  There is nothing in the record to show
> that he did not sufficiently assist his attorney throughout the trial.  Defendant's trial
> testimony shows that he was able to recall the events leading up to the shooting, and
> to recount them in great detail.  It appears that defendant became emotionally upset
> and frustrated during cross-examination.  The prosecutor simply asked questions he
> did not wish to answer.

---

[15]State rec., vol. 4 of 5, p. 539, lines 1-4; 9-12; 21-31.

Swain, 900 So.2d at 93.

It is well-established that an attorney has no constitutional obligation to raise a meritless claim or defense.  See Pruske v. Scott, No. 95-50261, 1995 WL 725626, at *3 (5th Cir. Nov. 6, 1995) ("Counsel was not ineffective for failing to pursue a meritless defense."); Krist v. Foltz, 804 F.2d 944, 946 (6th Cir.1986) ("An attorney is not required to present a baseless defense or to create one that does not exist."); United States v. Washington, Cr. A. 95-124-3 and 97-2371, 1997 WL 327459, at *2 (E.D. Pa. June 12, 1997) (counsel is not ineffective in failing to raise a meritless defense, because the outcome of the proceeding would not have been different if the defense had been raised). This is true regardless of the fact that plaintiff's former counsel may have thought an insanity defense should be pursued.[16]  See Woods v. McBride, 430 F.3d 813, 821 (7th Cir. 2005) (quotation omitted) ("We view counsel's performance deferentially, with the understanding that there is a great deal of room for disagreement among reasonable attorneys as to the appropriate strategy or tactics to employ in the course of representation, so we indulge the strong presumption that counsel rendered reasonably effective assistance.").

Plaintiff's claim that counsel was ineffective based upon his failure to use a peremptory challenge against Juror Cacibauda is also without merit.  As noted above, Mr. Cacibauda, during voir dire, originally indicated that he may hold a defendant's decision not to testify at trial against the defendant.[17]  Based upon this initial voir dire response, petitioner argues that defense counsel was

---

[16]On page 28 of his supporting memorandum plaintiff informs that his original, court-appointed counsel, "Katherine Bach of the Public Defender's Office", had prepared a motion for the appointment of a sanity commission.

[17]See discussion supra at pp. 24-25.

unconstitutionally ineffective due to his failure to strike Mr. Cacibauda from the jury pool by using a peremptory challenge against him.  However, further review of the voir dire transcript reveals that the questioning of Mr. Cacibauda did not end with his holding steadfast to the belief that a defendant must have something to hide if he chooses not to testify.  Before voir dire ended, Mr. Cacibauda's position on the issue of whether a defendant should take the witness stand had changed considerably.  Specifically, Mr. Cacibauda admitted that he could see why there may be reasons, other than having something to hide, for a defendant to choose not to testify and he assured that he would "not take away any points because [the defendant] didn't testify."[18]  Based upon these representations and based upon the considerable deference to which counsel's performance is entitled, the court concludes that counsel's decision not to use a peremptory challenge to strike Mr. Cacibauda did not render his representation unconstitutionally ineffective.

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the instant petition of Alfred Swain for habeas corpus relief be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided

---

[18] See supra at p. 25.

that the party has been served with notice that such consequences will result from a failure to object.

Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this _____17th_____ day of _____March_____, 2009.


_____
DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

31